# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

YOLANDA FIGUEROA VELAZQUEZ    *
   *
     Plaintiff    *
   *
        *    **Civil No. 97-1749(SEC)**
v.    *    **Title VII – Sexual Harassment**
   *
CARLOS C. RIVERA, et al.    *
   *
     Defendants    *
**********************************

## OPINION AND ORDER

Pending before the Court is defendants' motion for summary judgment **(Docket #29)**, which was duly opposed by plaintiffs **(Docket #34)**. Defendants filed a reply to said opposition **(Docket #41)**, to which plaintiffs filed a sur-reply **(Docket #44)**. The matter stands submitted and is now ready for disposition. Upon examination of the relevant facts, the applicable law, and the arguments advanced by both parties, the Court finds that defendants' motion for summary judgment **(Docket #29)** should be **GRANTED IN PART** and **DENIED IN PART.**

**Summary Judgment Standard**

The First Circuit has stated that:

> [s]ummary judgment has a special niche in civil litigation. Its role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). According to Fed.R.Civ.P. 56(c), summary judgment should issue whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also NASCO, Inc. v. Public Storage, Inc., 29 F. 3d 28 (1st Cir. 1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

For a dispute to be "genuine", there must be sufficient evidence for a reasonable trier of facts to resolve the issue in favor of the non-moving party. U.S. v. One Parcel of Real Property, 960 F.2d. 200, 204 (1st Cir. 1992). See also, Boston Athletic Assn. v. Sullivan, 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. Morris v. Government Development Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994).

In determining whether to grant a summary judgment, the Court may not, however, weigh the evidence. Casas Office Machines, Inc. v. Mita Copystar America, Inc., 42 F.3d 668 (1st Cir. 1994) Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." Id. citing Greenburg v. Puerto Rico Maritime Shipping Authority, 835 F.2d 932, 936 (1st Cir. 1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. Casas Office Machines, 42 F.3d at 684.

**Factual Background**

Defendant York Air Conditioning, Inc. ("York") is a Delaware corporation authorized to do business in Puerto Rico; its primary business is the wholesale distribution of commercial and domestic refrigeration systems. York Air Conditioning is a wholly-owned subsidiary of York

International, Inc.  Co-defendant Carlos C. Rivera ("Rivera") was York's Comptroller in Puerto Rico, and their highest-ranked official in Puerto Rico; he was plaintiff's immediate supervisor and was the person in charge of hiring her.  At the time plaintiff Yolanda Figueroa worked at York, it did not have a Human Resources officer or department.

Plaintiff was hired by York as an accountant at their Carolina, Puerto Rico facilities on December 5, 1988.  She had recently completed a bachelor's degree in Business Administration, and at the time was studying toward her Master's Degree in Business Administration, which she discontinued in May, 1989.

Plaintiff worked with invoicing in the Accounting Department.  There is some dispute as to whether Mr. Miguel González ("González") was plaintiff's supervisor.  Plaintiff alleges that she did not view him as such even though he always made certain that plaintiff had done her work correctly. However, it is uncontested that González assigned work to plaintiff since at least August, 1991. Plaintiff has also admitted that she was González's assistant.

The Accounting Department consisted of co-defendant Rivera, who was the Comptroller; González, who was an accountant; Mr. Luis Alvarado, who was an Electronic Data Processing Clerk; plaintiff, who was an accounting assistant; and an account receivables clerk, a position filled at different times in the relevant period, by among, others, Rosaura Font and Elisa Rodríguez.

At the time of her employment at York, plaintiff was a permanent resident of Arroyo, Puerto Rico, and during the work week she stayed at a student residence in Río Piedras, which she also managed.  For a time, plaintiff did not have her own car and González, who lived within walking distance of the office, nevertheless gave plaintiff a ride to and from work every day.  Plaintiff also socialized frequently with González and his sister, Ana.  González provided plaintiff with

transportation until September of 1989, when plaintiff bought her own car because González had resumed a romantic relationship with a former girlfriend.

Plaintiff's initial and ending classification was the same, Accounting Assistant, and at the time of her termination, February 12, 1993, she earned $1,330.00 a month.

Plaintiff was generally rated a good employee. Defendants characterize Rivera as "a very stern person who clashed often with employees both male and female because of his brusqueness." Plaintiff counters that there is no evidence that Rivera paid the same amount of attention to the male employees at York as he did to plaintiff, and that there is testimony by Rosaura Font that he paid excessive attention to plaintiff's personal matters. She states that Ms. Font testified that after witnessing Rivera's conduct toward plaintiff, she surmised that he was either in love with her or lusted after her body. Plaintiff also avers that Elisa Rodríguez also testified as to Rivera's rudeness toward plaintiff and female employees in general.

However, defendants counter with this same witnesses' deposition testimony, in which plaintiff admitted, in response to the question whether Rivera was rude to both male and female employees, that "he was rude sometimes." They add that González testified that "Rivera is a hard boss, a strict boss, and he is." They also correctly point out that Rosaura Font and Elisa Rodríguez did not testify as to specific conduct by Rivera that would constitute harassment; they merely testified as to their perception that Rivera paid plaintiff excessive attention. Defendants are correct when they state that perceptions are not evidence; as such they will not be considered by the Court when making our determination whether plaintiff was victim of a hostile working environment. See Pilgrims v. Trustees of Tufts College, 118 F.3d 864, 868 (1st Cir. 1997) (only admissible evidence will be used by district court when making a summary judgment determination).

Defendants further aver, and plaintiffs do not contest, that for some time prior to plaintiff's termination, Rivera was concerned that she was not giving her best efforts to the company and reprimanded her on several occasions, the last of which was on February 7, 1993, when he called her in to discuss her failure to complete the work for the closing of the fiscal year in January of 1993. They also argue that he had frequent clashes with Elisa Rodríguez, and reprimanded several female employees for wearing inappropriate office attire, especially short skirts.

Plaintiffs seek to counter defendants' assertions by arguing that pursuant to York's Disciplinary Regulations, the initial penalty for the negligent performance of job duties was a written warning, and the subsequent penalty would be a two-day suspension, followed by termination of employment for a third violation. Defendants do not contest that the rules were applicable, and that they were not strictly followed; however, they are correct in asserting that this alone does not serve as evidence that sexual harassment occurred.

On or about September of 1992, plaintiff requested a meeting to discuss a performance issue which had been raised by Rivera; this meeting turned into a shouting match. This event was witnessed by González, who was there at plaintiff's request.

The busiest period of the year for the Accounting Department is the closing of the fiscal year, which occurs at the end of the calendar year. On January 5, 1993 the financial reports for the fiscal year had not been completed. Plaintiff testified that she had one entry to finish but that Rivera and González would not stay to allow her to finish, even though they often stayed much later, and she was supposed to go home to her family in Arroyo to celebrate the upcoming Three Kings Day. Plaintiff left without finishing the required entry, and did not come the following day to finish it.

As a result of this incident, Rivera issued plaintiff a written warning dated January 29, 1993,

which was discussed by Rivera with plaintiff on February 5, 1993. In her deposition, plaintiff

recounted this incident as follows:

> During the meeting, Mr. Rivera talked to me about the memorandum, he said, read it. And then I read it. And he asked, "What do you think about that", and I said, "I do not agree with what it says here."
>
> And then he stated that I was not doing enough for the company and apparently something was bothering me, that my production, if we could call it that way, my production at work had been going down, and that possibly the place where I was living was affecting me, or rather he said, all those young people that you are living with are affecting you and it is not being good for you...
>
> "You are good Yolanda. If you were not a good employee, you would not be working for me." And then something else that he said... I am trying to remember. Because during this meeting with him, he brought up a lot of things regarding my private life. He brought up the environment in which I was living, the people that were around me, he brought up about my sunglasses, stating that because I was coming in to work in sunglasses, that perhaps I was spending all night partying.
>
> He told me that, aside from what I have already stated he said, he told me he had a friend who lived in a place in a boarding house or something, it was a work colleague that would fall asleep at his desk or come into work late, and when they came to realize what was wrong with him, it turned out that he used cocaine and from that...
>
> And when he told me this, regarding this coworker who was using cocaine, I wanted to try and bring it up, to confront him with it, and I said, "Are you referring to, I mean, are you talking about me?" And he said no, "I am just referring to your environment which is affecting you a lot, and although you are a good employee, you need to give more to the company. You need to give more" and then at that time when we were talking, he also made a comment about my body, and he said, "You can get whatever you want, you are an educated woman, you are a professional woman. I do not know what happened with the CPA test which you were going to take and then threw it into the trash, but you are a professional woman, you are pretty, you have a good body, you can get anything you want, Yolanda" and he said "I could hurt you a lot with this. I could put it in your file, but I am not going to do that. I am not going to put this memo into your file, and in fact, you know, I am the one who makes the decisions for the bonuses, and I could take that from you, but I am not going to. You have a bonus..."
>
> Deposition of plaintiff, pages 91-91; 103-107.

Plaintiff did not believe that she had to improve in any of the areas mentioned by Rivera. A week later, on February 12, 1993, plaintiff replied to this warning in a four page memo in English, denying each and every one of the performance issues raised by Rivera. Plaintiff sent a copy of the memo to Rivera and González, as well as Ron Kunkle and John de Jesús, officers of York International. The relevant portion of plaintiff's memorandum states:

Finally, let me suggest to you, not to assume things, please communicate. If you feel that my work does not meet your requirements, tell me about it. Please, don't let your personal prejudices affect me as an individual and my job. *If you feel that women can't do as well as men do on this type of work*; and if you commented you didn't like my dwelling place, the people that surround me, the eyeglasses I use for my own need and other many personal things that in my opinion have no bearing on the work that I realize in York; don't let this thing affect it. All things that are of personal concern don't matter to anybody, except myself. I disagree with you in respect that these things could be affecting my performance. I can assure you that these reasons have not interfered with my doing a job well done because, no matter what obstacles I have confronted I have overcome them and I shall continue to do so with the same determination and interest as when I started with York International. And if those are your reasons for warning me with further actions to be taken in respect to my person, *let me warn you that they are not valid reasons and constitute reasons that reflect discrimination in violation of my civil rights and could be a serious problem for you personally, and for the company as employer.*

Plaintiff's memorandum of February 12, 1993 (emphasis added).

Plaintiff was terminated from her job at York one week later, on February 19, 1999. Plaintiff described the meeting between her and Rivera in the following manner:

"Where did you get all this from" and I said "Everything that is there is what is happening, and everything is there is true" and he said, "I want you to retract everything that you said there," and I said "I am not going to retract anything, because everything stated there is the truth."

"Since you do not accept the corrective discipline, then you are dismissed." That is all.

Plaintiff's Deposition at p. 143.

Prior to her termination, the only written warning that plaintiff had received was related to

disrespectful or insubordinate behavior. In December of 1991, plaintiff received a warning from González because of a disrespectful response to an oral correction. González had returned from making a deposit at the bank, and stated, according to her, in a very rude manner, "Yolanda, you have to write down the account number on the back of the check," to which she replied, "If you want it done well, do it yourself." When she received the written reprimand, she crumpled it and placed it on the bulletin board behind her desk, where it could be seen by anyone, client or employee, that walked into the accounting department. As a result of her placing the warning on her bulletin board, she was also reprimanded by Rivera, who told plaintiff that she had to respect González because he was her superior. She characterizes this reprimand in the following manner; "He stated that I was a good employee, and that this type of thing did happen, but that I was doing a good job, but needed to improve in that aspect." All other warnings or corrections to plaintiff were oral.

It is an undisputed fact that Rivera never asked plaintiff to work on Friday evenings, Saturdays, or Sundays when there would be nobody else in the office. He never asked her out, and never made any sexual solicitation of plaintiff.

On March 3, 1993, plaintiff filed a discrimination charge with the Anti-Discrimination Unit of the Puerto Rico Department of Labor and Human Resources alleging that she was terminated because she rejected Rivera's sexual advances. She said that she had not complained about Rivera's conduct because she feared that if she said something she would be fired from her job. In fact, prior to her February 12, 1993 memorandum, plaintiff had not complained to anyone at York that she was being subjected to unwelcome sexual advances by Rivera. In the affidavit filed before the Department of Labor, there is a blank to mark whether the employee is claiming retaliation in the discharge. While plaintiff checked off the blank relating to discrimination because of sex, the blank

regarding retaliation was left blank.

There is a factual controversy regarding whether plaintiff was aware of York's anti-discrimination and harassment policies. While plaintiff admits that she received an explanation as to what constituted sexual harassment and how the same was prohibited by the company, she claims that none of the employees at York were advised on how to file a sexual harassment complaint and were never advised as to the procedures governing a sexual harassment investigation. Defendants argue that not only had plaintiff received the above-cited orientation regarding sexual harassment, she had also been advised of the company policy against inter-office romances as it regarded her relationship with a York guest from Mexico, Chavez.

The following is a summary of the incidents related by plaintiff in support of her claim that she was subjected to sexual harassment by Rivera:

(1) In September of 1989, plaintiff bought an automobile and Rivera told her that she should not have done that.

(2) In January of 1990, Rivera called plaintiff to her office to discuss her evaluation. He stated that she was a good employee and that he wanted her to continue working for the company. According to plaintiff's deposition, he also stated that "he was very happy to have me, that I was a pretty woman, that I had a nice body, and that I could get anything that I wanted out of life." Plaintiff did not reply to this statement and that was the extent of the incident.

(3) Around March of 1990, plaintiff delivered some documents to Rivera and he made the following comments:

> Yolanda, the clothes that you are wearing are very nice, but when you are ready to change the dress, change it for a different one, because I am a man and I have to be taking cold baths every five minutes ... that the dress was very nice, that I did not

have to change it at that very instant, but when it was time for me to change it, to change it for an office dress.

According to plaintiff, the dress at issue had a short top that if she raised her arms slightly some of her stomach would show.

(4) The week after Rivera called her attention to her attire, a client wanted a check issued immediately, and even though plaintiff knew that it was against company procedures, she made out the check and went to Rivera in order to get his signature. He told her in a very rude manner that "this was not a charity, this was a company". Plaintiff went into the ladies' room and broke down crying.

(5) In December of 1990, York held a party for its dealers. At work, Rivera questioned plaintiff as to why she had danced so much with Chavez. Rivera told her to be careful, that company policy established that there could be no relationships, no boyfriend-girlfriend relationships between people at the company. That was the extent of the incident.

(6) Around February or March of 1991, plaintiff went to lunch with Chavez, and Rivera paced around the office until she returned. He then called Chavez into his office and closed the door, and subsequently called plaintiff into his office, also behind closed doors. She stated that the following occurred:

> He told me that I needed to be careful, that I was very attractive, and that all the men in the office were after me, and that if he were single, then he would be after me as well.
>
> He also repeated that I had a nice body and that I was attractive; that I was a good employee, but that since I was attractive, I needed to be careful.

Plaintiff did not respond to Rivera.

(7) Around May of 1991, Rivera moved plaintiff's desk so she would be in the line of sight

of the clients as they went into the showroom, because he did not want plaintiff involved in conversation with them.

(8) Around September 2, 1991, Rosaura Font, who had been in charge of credit and accounts receivables, requested a transfer to the service department. Elisa Rodríguez, who had been the manager's secretary, was transferred to Font's position.

When Font was transferred out of the Accounting Department, Rivera told plaintiff that the position should have been for her because she had the ability and the experience to deal with credit, but that she was not being given the position because she was a single woman and since she was pretty and had a nice body, that could cause the clients to be disrespectful toward her. Plaintiff replied that she did not have a problem, that she had no objection to Rodríguez being transferred to Accounting, and that the decision was up to him. Plaintiff does not contend that Font's position was a promotion or that she requested and was denied the position.

(9) Near the end of 1991, a man who had been plaintiff's employer prior to her employment at York, went into York to buy an air conditioner, and ran into her by chance; he asked her to take him to lunch. Rivera sat at the table next to them, and listened to the conversation. The former employer was offering her a position, telling her that he had opened another supermarket and as soon as he could, he was going to offer her a position as an accountant.

When plaintiff returned to the office, Rivera called her behind closed doors and asked whether she would be leaving the company. He told her that she was a very good employee and did not want her to leave. That was the extent of the conversation.

(10) On January of 1992, Rivera congratulated her for having had a good year in the company as well as for having received a salary raise. He said that he was happy with her, congratulated her

on the wage increase, that she was pretty, and that she could get whatever she wanted because she was pretty and she had a good body. She did not reply.

(11) On September 4, 1992, Rivera confronted plaintiff about her failure to have given proper instructions to Ana González, Miguel González's sister; Ana González had apparently left without completely some work due to plaintiff's alleged failure to give her certain instructions. Rivera was very upset, and told her that she was supposed to be in at six in the morning, according to him, and he practically slammed the door in her face. According to plaintiff, at that point in time she felt a lot of pressure at work and did not want to be there "that much". Plaintiff stated that her working hours were from eight to five, and that therefore she did not have to be in at six in the morning to give Ana González instructions.

Because plaintiff felt that she was being reprimanded due to someone else's failure to perform her work, she requested a meeting with Rivera at five p.m. Plaintiff avers that during that meeting, she told him that she was trying to do Elisa Rodríguez's work in Credit and Collections, trying to do part of the accounting job, and trying to help Ana González with her work.

Rivera then questioned her regarding the fact that she had not been coming into the company early, that lately she had not been dedicating time to the company, and stated that she was a good employee, but that lately she had been "pelando el diente" (smiling) with the customers, and that he was concerned that she would fall into the hands of someone that did not deserve her.

Plaintiff began to respond, but Rivera interrupted her with a series of rapid comments regarding the way that she interacted with clients. She replied that he had to understand that she was trying to do her work. Rivera answered back, "You do not talk to me like that" and hit the desk with his fist. According to plaintiff, "He told me to be quiet, and he told me that I was too... friendly with

Civil No. 97-1749(SEC)                                                                    13

the clients. And that I must understand that we were in an office, and that needed to be respected."

Plaintiff states that she was scared by his rudeness and became quiet. According to her testimony, he then lowered his tone of voice and told her that she was a good employee, and that otherwise she would not be with the company, but that she had to give more of herself to the company. At that point, plaintiff picked up her purse, and told Rivera "that is everything that we need to talk about, then I am leaving," and left. Plaintiff left so upset that Rivera called her home in Arroyo to inquire from her parents how she was doing.

Plaintiff does not allege any further incidents until the February 5, 1993 meeting in which Rivera called her in to discuss her performance, and his disciplinary memo of January 29, 1993. His statements to her at that meeting correspond to plaintiff's complaints summarized in her February 12, 1993 memorandum, discussed supra.

As stated above, plaintiff does not allege that Rivera ever invited her out alone, even to lunch, or requested that she stay late or work weekends to be alone with her. She states that Rivera's approaches always consisted not in what he could offer her, but in what she had to offer.

**Applicable Law – Title VII's proscription of sexual harassment due to a hostile work environment**

Title VII provides that:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."

42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of discrimination forbidden by Title VII. Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 436-37 (1st Cir. 1997).

The U.S. Supreme Court has made clear that Title VII "evinces a congressional intent to

strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal citations omitted).

There are generally two recognized types of sexual harassment: quid pro quo harassment and harassment due to a hostile work environment. See Landrau-Romero v. Caribbean Restaurants, Inc., 14 F. Supp.2d 185, 189 (D.P.R. 1998). "In quid pro quo harassment, an employer conditions the granting of a job benefit on an employee's response to sexual overtures, or punishes the employee for refusing to comply." Id. Plaintiff does not advance that any terms of her employment were conditioned upon her response to any sexual overtures made by Rivera; in fact, she states that Rivera never made reference in his overtures in what he could offer her, but instead always referred to what she had to offer. Therefore, we shall not address the facts underlying her claim under a quid pro quo theory, but shall analyze them to determine if she has made out a case of harassment due to a hostile work environment.

To make out a claim of hostile work environment, a plaintiff must prove that:

(1) she belongs to a protected group;

(2) she was subjected to unwelcome sexual harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer knew or should have known of the harassment and failed to take remedial action.

See Tosado Cotto v. General Accident Insurance Company of Puerto Rico, Limited, 975 F. Supp. 410, 414 (D.P.R. 1997); Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986).

AO 72A
(Rev.8/82)

The Supreme Court has stated that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris, 510 U.S. at 21 (internal citations omitted). In fleshing out what constitutes a hostile work environment, the Court stated that the standard set forth in Harris "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Id.

The Court has stated that "[t]his is not, and by its nature, cannot be, a mathematically precise test," Id., but courts should look at, among other things, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23.

"The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Oncale v. Sundowner Offshore Services, Incorporated, ___ U.S. ___, 118 S.Ct. 998, 1002, quoting Harris, 510 U.S. at 25 (Ginsburg, J., concurring). In furtherance of the requirement that the conduct at issue must be severe in order to be actionable under Title VII, the Court has stated that "the statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the conditions of the victim's employment." Oncale, 118 S.Ct. at 1003 (emphasis added).

While the contours of what constitutes a hostile working environment must be evaluated on

a case-by-case basis, "conduct which is merely overbearing or boorish will not, by itself, be sufficient to constitute a hostile work environment, unless there are underlying motives of a sexual or gender discriminatory motive." Cardona v. Aramark Services of Puerto Rico, 9 F. Supp.2d 92, 97 (D.P.R. 1998). Furthermore, "[w]hile an employee can demonstrate that there is a sexually hostile working environment without proving blatant sexual misconduct," Spain v. Gallegos, 26 F.3d 439, 447 (3d Cir. 1994), the conduct involved must be found offensive by a "reasonable person". That a person subjectively finds an environment abusive will not be sufficient, in and of itself, for a court to find that an employer violated the statute. See, e.g., Mullenix v. Forsyth Dental Infirmary for Children, 965 F. Supp. 120, 152 (D. Mass. 1996).

In short, we must evaluate the incidents complained of by plaintiff to determine if they objectively comprise the severe conduct that creates a hostile working environment, as proscribed by Title VII.

**Analysis – Plaintiff has failed to state a claim of hostile work environment under Title VII**

The Court finds that the conduct complained of by plaintiff does not amount to the kind of severe conditions that are necessary for a finding that she was subjected to a hostile work environment. While it is true that Rivera made several inappropriate references to plaintiff's physical attributes, it cannot be said that the motive underlying these references was discriminatory. Plaintiff has admitted that all of Rivera's comments regarding the fact that she was a beautiful woman and that she had a nice body were made in the context of giving her praise and encouragement, when he also told her that she was smart, she was a good employee, and could get anything she wanted because she was an educated professional. It cannot be said that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently

Civil No. 97-1749(SEC)                                                                    17

severe or pervasive to alter the conditions of victim's employment and create an abusive working environment." See Harris, 510 U.S. at 21.

It is evident that this case does not involve the kind of sexual misconduct that clearly gives rise to a finding of hostile work environment. While it is true that blatant sexual misconduct of the kind complained of in Meritor, Harris, and Oncale is not necessary in order for a plaintiff to prove that she was subjected to sexual harassment because of a hostile work environment, courts have held that boorish conduct will not be sufficient for such a finding. In addition, while we must pay attention to plaintiff's subjective claims that the conduct at issue was unwelcome, offensive, and interfered with her ability to perform her duties, we must not forget that we must evaluate said conduct under an objective standard.

It is undisputed that Rivera never propositioned plaintiff in any way, never asked her out alone, and never asked her to remain or to come to work while they would be alone in the office. The complained-of incidents occurred over a period of over four years, and by all accounts, during the entire time plaintiff was able to adequately perform her duties, her level of compensation was raised, and she received all programmed bonuses. In short, we find that even viewing all the relevant facts in the light most favorable to the plaintiff, Rivera's conduct does not amount to a hostile work environment. Plaintiff's claims of sexual harassment under 42 U.S.C. § 2000e-2(a)(1) must therefore be **DISMISSED**.

**Applicable Law and Analysis – Whether plaintiff's claim of retaliatory discharge falls within**

**the scope of the administrative charge**

In <u>Powers v. Grinnel Corp.</u>, 915 F.2d 17, 38 (1st Cir. 1990), the First Circuit held that an employee is not required to set forth in the administrative charge all of the facts and theories on which her claim is based with "literary exactitude". However, the Court has also stated that this does not permit an employment discrimination complainant "to file general charges with the [administrative agency] ... and then expect that this allegation will permit all claims of [sex-]based discrimination in a lawsuit." <u>Lattimore v. Polaroid Corporation</u>, 99 F.3d 456, 464 (1st Cir. 1996). Also, a complainant is not allowed "to make a specific claim based on one set of facts and later, assert an entirely different claim based on a different and unrelated set of facts." <u>Id.</u>

The purpose of an administrative charge is to "provide[] the [agencies] with information and an opportunity to eliminate the alleged wrongful practices through informal methods of conciliation." <u>Powers,</u> 915 F.2d at 37. The critical question is not whether the administrative charge contains all the details contained in complainant's allegations; "[r]ather, the critical question is whether the claims set forth in the civil complaint come within the scope of the [agency] investigation which can reasonably be expected to grow out of the charge of discrimination." <u>Id.</u> at 39 (internal citations omitted).

Defendants argue that plaintiff's claim of retaliatory discharge is time-barred because it was not included in her original administrative charge. It is undisputed that in the affidavit containing the original administrative charge, dated March 3, 1993, there was a box where complainant had to check the "cause of discrimination". In response to that question, plaintiff checked off the box labeled "sex" but did not also check off the box labeled "retaliation". However, plaintiff correctly asserts that even though plaintiff did not check off the "retaliation" box, it is clear from the face of

her complaint that she is alleging that she was fired in retaliation for her claims of differential treatment.

In her charge, plaintiff avers: *"Although I did not like this behavior, I did not dare to claim because I feared retaliation.* On February 19, 1993 he unjustifiedly fired me, and I consider that the reasons he gave me for that are pretextual and that the real reason is that I never agreed to the approaches he made to me." (Administrative Charge of March 3, 1993) (emphasis added).

It is clear to the Court that although plaintiff could have fleshed out her claim of retaliation in further detail in her administrative charge, under the rule that the charge and the subsequent pleadings do not have to match with "literary exactitude", she made out a sufficient claim of retaliatory discharge that the issues related to said retaliatory discharge would have come within the scope of any administrative investigation into her dismissal. Furthermore, we find that these allegations sufficed to put the employer on notice that plaintiff was not only claiming that she was sexually harassed while she was on the job, she was also claiming that she had been retaliatorily discharged. In light of all of the above, it cannot be said that plaintiff's claim of retaliatory discharge does not come within the scope of her administrative charge and is thus time-barred.

**Applicable Law and Analysis – Whether plaintiff has made out a claim of retaliatory discharge**

The First Circuit has held that "[w]here ... there is no evidence of the defendant's retaliatory animus, the <u>McDonnell Douglas</u> burden-shifting framework is used to allocate and order the burdens of producing evidence." <u>Fennell v. First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1st Cir. 1996). In order to make out a *prima facie* case of retaliatory discharge under Title VII, plaintiff must prove by a preponderance of the evidence that:

(1) she engaged in a protected activity as an employee;

(2) she was subsequently discharged from employment; and

(3) there was a causal connection between the protected activity and the discharge.

Hoeppner v. Crotched Mountain Rehabilitation Center, 31 F.3d 9, 14 (1st Cir. 1994).

The First Circuit has also held that plaintiff's failure to prove her discrimination claim is not dispositive of whether she can make out a *prima facie* claim of retaliatory discharge. "It is enough that the plaintiff had a reasonable belief that a violation occurred; that [she] acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it." Mesnick v. General Electric Company, 950 F.2d 816, 827 (1st Cir. 1991).

Under the McDonnell Douglas burden-shifting framework, a plaintiff must first prove a *prima facie* case of discrimination, as detailed above. Second, if she succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the discharge. Finally, if defendant complies with this duty of production, plaintiff must then prove that the stated reason is merely a pretext, and that the true reason for the discharge was discriminatory. See, e.g., Jennings v. Tinley Park Community Consolidated School District No. 146, 796 F.2d 962, 966 (7th Cir. 1986).

We must thus first analyze the relevant facts to determine whether plaintiff has made out a *prima facie* case of retaliatory discharge. Defendants argue that plaintiff does not meet the first prong of the *prima facie* case, insofar as they claim that plaintiff's memo of February 12, 1993 does not qualify as protected activity. They say that plaintiff merely makes a general reference to her civil rights, and does not mention the words "sexual harassment" anywhere in the memo. Plaintiff counters that the memo clearly contains claims of disparate treatment, and a threat of further action if the situation was not corrected. She argues that defendants admit that they saw the memo as a

threat by plaintiff that she would take action against York, claiming that she was being unfairly treated by Rivera because she was a woman, and that they thought that plaintiff was aided in preparing the memorandum by an attorney. We agree with plaintiff that while nowhere in the memorandum does she say the talismanic words "sexual harassment" and instead makes mention of her "civil rights", it makes enough references to what plaintiff perceived to be unfair and disparate treatment on the part of Rivera because she was a woman to come within the ambit of "protected action."

There is no doubt that plaintiff meets the second prong of the *prima facie* case as she was discharged from her employment. We must thus address whether she meets the third prong of the *prima facie* case, that there be a causal link between the protected activity and the adverse employment action. We find that there is sufficient evidence that plaintiff was fired because she threatened York with a lawsuit claiming sexual discrimination. First, there is a clear temporal link between plaintiff's submission of the memo, and her subsequent discharge a week later. Furthermore, at the meeting where she was discharged she was told that if she took back the memorandum, then everything would go back to the way it was, and they would forget that the entire incident had ever occurred. When she refused to do so, stating that everything that she had written was the truth, she was fired on the spot because not taking back the memo meant that she "could not accept corrective discipline". Thus, it is clear to the Court that plaintiff has established a causal link between her submission of the memorandum claiming sexual discrimination and her discharge from employment at the meeting where she met with her boss to discuss the allegations contained in it. Plaintiff has therefore established a *prima facie* case that she was retaliatorily discharged in violation of Title VII.

Plaintiff having established a *prima facie* case of retaliatory discharge, we must turn to defendant, who has the burden of producing a legitimate, non-discriminatory reason for the discharge. The Seventh Circuit has found that "[d]efendant ... may not offer merely any non-discriminatory reason for the discharge. Defendant must offer a legitimate reason." Id. at 967. Defendant claims that plaintiff was fired because she would not accept "corrective discipline." However, they admit that plaintiff was fired after having received only one written warning, and that her discharge was contrary to established company policy that it took three written warnings before an employee was discharged. We find that defendant's proffered reason, that plaintiff failed to accept corrective discipline, is akin to the "disloyalty" reason found invalid by the Seventh Circuit in Jennings. As the Court stated in Jennings, "if mere 'disloyal' conduct could provide a legitimate basis for discharge, the protection extended by section 2000e-3 would be severely limited." Id. at 968.

Similarly, we find that if discharge following a complaint of sexual discrimination by a plaintiff can always be justified under the guise of "failure to accept corrective discipline", the prohibition on retaliatory discharge contained in the statute would be severely weakened. We thus find that defendant has failed to proffer a legitimate, non-discriminatory reason for plaintiff's discharge, particularly in light of the fact that plaintiff had only received one written warning prior to her discharge, and that her firing was against established company policy. In light of that, plaintiff's claim of retaliatory discharge must stand, even in light of the fact that we have found that she has failed to state an actionable of sexual harassment due to a hostile work environment.

**Analysis -- Whether plaintiff's supplemental law claims should be dismissed**

<u>Civil No. 97-1749(SEC)</u>                                                                 23

Defendants limit their discussion regarding plaintiff's supplemental law claims to arguing

that the same should be dismissed if the Court dismisses all of plaintiff's federal law claims pursuant

to its authority under 28 U.S.C. § 1367(c).  However, defendants have failed to argue that plaintiff's

supplemental law claims should be dismissed on any substantive grounds.  We shall therefore not

address any substantive issues regarding her claims under Puerto Rico law.  In light of the fact that

the Court still has federal question jurisdiction over plaintiff's claims of retaliatory discharge, we

shall maintain jurisdiction over plaintiff's supplemental law claims as they clearly "stem from a

common nucleus of operative fact" as contained in the supplemental jurisdiction statute

**Conclusion**

Pursuant to the above discussion, defendants' motion for summary judgment **(Docket #29)**

is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's claims of sexual harassment in

violation of 42 U.S.C. § 2000e-2(a)(1) shall be **DISMISSED**.  However, plaintiff can proceed with

her claim that she was retaliatorily discharged in violation of 42 U.S.C. § 2000e-3, as well as with

her supplemental law claims under Puerto Rico law.  Partial judgment shall be entered accordingly.

In addition, parties are hereby **ORDERED** to submit the Pretrial Order in the above-captioned case

by **October 22, 1999**.

**SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 1999.

SALVADOR E. CASELLAS
United States District Judge